Alexi Nunez Sardinas, Alissa Sardinas, Supervisor of the Attorney for the Department, and the Attorney General's Assistant, Brian Kim. Welcome back. It's still the morning? Good morning still, Your Honors. I'm glad we could do this in one day for you. Yes, and in the same courtroom. Thank you. I don't know if I had anything to do with it or not, but anyway, I'm glad you're still here. Okay, you may proceed. Thank you. Brian Kempfer is also a third-year law student at the University of Michigan, and I will be supervising him today. Thank you, Your Honor. You're welcome. Good morning. Good morning, Your Honors. May it please the Court, my name is Brian Kempfer, and I appear on behalf of the appellant, Mr. Alexi Nunez Sardinas. Before I proceed, may I reserve three minutes for rebuttal? Very well. The District Court erred in giving Mr. Nunez a two-level leadership enhancement, because giving such an enhancement is inconsistent with both the spirit and the letter of the Sentencing Guidelines. It's inconsistent with the spirit of the Sentencing Guidelines because it fails to take adequate account of Mr. Nunez's relative responsibility as compared to his co-conspirator, Mr. Benavides Rodriguez, as is required by the background commentary to the Guidelines, as well as this Court's precedent in cases like Gibson and Munoz. It violates the letter of the law because it is inconsistent with Application Notes 2 and 4 of the Commentary to the Sentencing Guidelines. In this particular case, Mr. Nunez, the District Court below did not take account of the relative responsibility of Mr. Nunez and his co-conspirator, Mr. Benavides Rodriguez. What was the guideline level as enhanced? Thirty-two, Your Honor. But what was the resulting guideline range? The resulting guideline range, I believe, was 122 to 155 months. And what was the guideline range unenhanced if the two-level enhancement had not been imposed? I believe it's 97 to 100. And what was the sentence that was imposed? The sentence that was imposed was 97 months after a departure. A downward variance. Yes. I'll be very candid with you. I do this from time to time. I'm a district judge. I do lots of sentencing. And it's my understanding that it's okay for me to do it, that I avoid an appeal and the risk of reversal. I find the enhancement. I do it because I really think it belongs, as the judge did here. And then, as a safety valve for myself, and as a break for the, and also because I think that the particular sentence is what is appropriate under Booker. Not infrequently, I will vary. And I'll often vary within the unenhanced guideline range. And this judge did even more. This was a variance even without the enhancement. And if I'm wrong in my assumption, and that's my question to you, that there's no harm, no foul from having imposed the enhancement, but then adjusting the sentence under Booker by varying to remove the effect of the enhancement. And let me give you my response to one argument is, well, Judge, we don't know what sentence the judge might have given had the enhancement not been employed in the first place. My answer to that is no, because we're charged, according to my understanding, under the guidelines. Looking to the guidelines as advisory, but then we apply the Section 3553A factors to impose the sentence that is sufficient but not necessary, not sufficient but not greater than that necessary to accomplish the purpose of sentencing. And that's 96 months. I assume that the sentencing factors were all looked at and made manifest on the record. And so if that's a judgment that's sufficient but not greater than necessary, what difference does the up and down, sideways movement with the enhancement make? That's my question in the case. Your Honor, the difference that the enhancement, the up and down movement of the enhancement, is that it sets an anchoring point from which the judge, the district court judge, will determine when a variance is appropriate. And the judge gave reasons for the variance in this particular case, and they weren't related to Mr. Nunez, the questionability of Mr. Nunez's leadership enhancement. They were related to the relatively minimal scope of the conspiracy, and they were related to the fact that Mr. Nunez was a first-time offender. And because those factors are present with or without the enhancement, the fact that the enhancement is found in this case means that it's more likely that the judge took the enhancement into consideration when she was both calculating the guidelines range and also passing sentence. So in the example you gave, Your Honor, if the judge were to say, I'm not entirely sure about the enhancement or because the enhancement here is questionable, then we would have reason to know that the particular fact, there is no harm, no foul. Whose burden is it to raise and establish that issue? Why isn't it the burden of defense counsel in that situation saying, when the Bostick question is asked, does any counsel have any objection to any part of these proceedings not previously made? Judge, for purposes of possible appellate review or for the record, please will you tell us, had you not imposed the enhancement, is this a sentence taking into account all the 3553A factors that you would have imposed? Or, Judge, please state on the record what role the fact that you found leadership role plays in your determination that this variance is appropriate. So notice that the record would be clear, and why isn't it the defense attorney's obligation, as part of the overall objection to the fact of enhancement, the adverse finding on the enhancement, to make sure what it is the sentence reflects. I've never had a lawyer ask me that, but I'm trying to go through this process as we talk, because it would be helpful to me to understand. Right, Your Honor. Not necessarily in this case, but also in my job, okay? Yes, Your Honor. First of all, I'm not aware of any precedent on point on that particular question, and speaking specifically about that particular matter, I think what the attorney did by objecting both to the PSR and to the sentencing enhancement during the sentencing hearing was state, Your Honor, this is not an adequate grounds upon which to base a sentence. So that objection was meeting the attorney's burden to establish that the leadership enhancement did not support an enhancement in this particular case. Take it out, and maybe the sentence might have been less. Right. And we don't know, and that's the problem I'm trying to raise. Okay. Whose responsibility is to preserve that in the record so that there is a record, so the reviewing court knows and the defendant knows and the prosecution knows? And I don't know, okay? It just occurred to me sitting here. Yes, Your Honor. And I think, again, just by raising the objection and noting that the sentencing enhancement is not warranted in this case meets the defense counsel's obligation to note that it's not appropriate for the judge to rely on the sentencing enhancement in this particular case. I apologize, but I actually had my law clerk do some research, and I think it's Sixth Circuit law, and maybe your supervising counsel or government counsel might know, but I thought it was Sixth Circuit law that, you know, a sentence that this sentence will survive muster, and maybe it won't. Okay, and I may be mistaken on that. Pardon me, Your Honor. No, go ahead. The only precedent I'm aware of on point is precedent talking about harmless error, and in that particular case, you don't reverse for harmless error when the departure doesn't make it, when the enhancement doesn't make any difference because even if the enhancement were not applied, the sentencing range would be below the statutory mandatory minimum. I see. It's a statutory minimum issue and not, okay. Yes, that's the only precedent that I'm aware of on point, Your Honor. And that may have been what he and I were discussing, okay? I didn't do my homework sufficiently on that, so thank you. In this particular case, the district court didn't take account of the ---- Why? Let's take this. I'm serious. I mean, it's very serious. I'm thinking this through because it is my practice, and I think quite candidly many district judges do that. Okay, I find the enhancement. I think it belongs there. I've stated why. I think I've done my job. But, you know, let's go from there. Now, why isn't this sort of a quasi-Bostick issue that if there's ---- I understand Bostick. If there's some loose thread and you want later to raise the issue on appeal, that's why we have at the conclusion of every sentencing we ask the Bostick formula so that we try to sweep everything in so that the record is preserved. And shouldn't somebody have the burden, whether it's the government or the ---- and it may be the government's burden, I think. And I know you didn't come prepared to talk to this, but it's a matter of importance to me. I do want to say, as far as the government's burden in this particular case, the guidelines in this court's precedent make clear that the government bears the burden of proof by a preponderance of the evidence of the enhancement. And in this particular case, the PSR did not find that the enhancement was appropriate in this case. The government objected, stating that the enhancement should be applied, and defense counsel responded by objecting and turned to the application, which the probation officer adopted. Do I recall correctly or incorrectly? I thought that the final PSR supported the enhancement. Am I wrong? The final PSR did, Your Honor. The original did not. The government objected, and then in response the probation officer changed the PSR. But that's the way it's supposed to work. After an initial disclosure, both parties get a chance. Usually, of course, it's the defendant who's objecting. Anyway, so the final PSR the judge considered included the enhancement, and that's why the whole issue was there for consideration. That's right, Your Honor. Let me ask you a somewhat different question. Did you specifically raise at sentencing the concern you raise now that the district court had some obligation to be looking at relative levels of responsibility as opposed to how large the organization was or how much control the defendant exercised? So, Your Honor, the argument was primarily that there wasn't sufficient evidence to show that Mr. Nunez exercised control over Mr. Benavidez-Rodriguez. I don't believe counsel raised the issue of relative responsibility at sentencing. Let me ask another question along those lines, then. What's your best case law support for your view that the district court erred in failing to consider levels of responsibility in addition to determining what kind of control the defendant exercised? Your Honor, I see my time has expired. May I have some time to answer the question? Yes, you may. Go ahead. Your Honor, I think one of the best cases to cite in this particular case is United States v. Munoz. Which involves a leadership enhancement very similar to this. And the court relied on relative responsibility in assessing whether an individual was responsible for controlling a courier. Does that case say that the court errs if it doesn't look into relative levels of responsibility? So the case law that talks about the court not properly evaluating relative responsibility would be Gibson, Your Honor. Pardon me. That case found that there wasn't sufficient evidence to either support relative responsibility for the defendants or to support that the defendants exercised control over their co-conspirators. And if Your Honors have no further questions, I will reserve my time for rebuttal. Very well. Thank you. Good morning. Good morning, Your Honors. May it please the Court. Adam Reeves on behalf of the United States. Your Honors, I think it's important to start off with this notion of relative responsibility because as Mr. Sardinus points out, it is the spirit that motivates the application of 3B1.1. However, in this case, I think Mr. Sardinus misconstrues exactly what we're looking at when we consider who is most relatively responsible for the crime charged. Mr. Sardinus sort of casts this as a competition to see who is the worst drug dealer among those in the conspiracy. But what 3B1.1 really focuses on and what it enhances for the sentence is what responsibility did the defendant have for advancing or expanding the actions of the joint criminal enterprise. So it doesn't consider whether in other circumstances, Mr. Rodriguez might have been involved in other drug dealings with other conspiracies unrelated to this one. It asks solely about the conspiracy that's charged in the indictment. And what we see in the facts of the record in this case is that Mr. Sardinus directed another member of the conspiracy, Mr. Rodriguez, to deliver a quantity of oxycodone pills to a third co-conspirator named only Chino by the evidence that we have. And that in following those directions, or in giving them rather, Mr. Sardinus exercised control or authority over at least one other participant in the conspiracy. This is what the case law from the Sixth Circuit has pretty uniformly said legally justifies the application of 3B1.1. There are several cases I think that are particularly on point, one of which was in fact just raised by Mr. Sardinus' appellant counsel, and that is that of United States v. Munoz. There we see a very similar factual scenario, one in which the defendant has discussions with someone who turns out to be a confidential informant setting up a drug deal. And then directs another co-conspirator to deliver the drugs to the person that turned out to be the confidential informant. Now there are a few I think what are minor differences from that case, but nonetheless the court in Munoz identified that it was the instruction of another co-conspirator to act as a drug courier that justified the application of 3B1.1. And it did so in the context of the defendant in Munoz arguing that he was really just a middle man, that he wasn't sort of the worst drug kingpin, even within his own conspiracy, limited as it was. There weren't a large I think number, I think there were 25, but nonetheless this person was arguing he's only sort of in the middle of all the people in this conspiracy, and the court said, well it doesn't really matter if you're the only leader, because there can be more than one supervisor or manager in a conspiracy. And indeed the commentary to 3B1.1 makes clear that as the conspiracy gets smaller, under five participants as set out in the letter of 3B1.1, the distinctions between things like being a manager or a supervisor become less important. And in Munoz the Sixth Circuit says, look you exercised control or authority over your co-conspirator by telling him when, where to go deliver drugs, and in that case the co-conspirator did so. I would also point this court to another decision, and this is not raised in the United States' brief, in large part because it was issued at the time that the United States finalized its brief. It's United States versus Anderson, and I will note for the court that the citation is 795, Fed Third, 613. It was issued on August the 4th of 2015, and there one of the issues that is, the Sixth Circuit, Your Honor, one of the issues that is raised by the defendant in that case is the application of 3B1.1b, because there the conspiracy exceeded five people. But the court discusses all of the evidence, and what was shown is that the defendant in that case, who was in fact I think the girlfriend of the drug kingpin of that conspiracy, instructed two juveniles to transport drugs from Nashville to Las Vegas and ultimately Los Angeles. And the court noted in its opinion that there was some dispute about the extent of the supervision, but it held that simply acting as a supervisor, this person supervised the juveniles who transported drugs as couriers, simply doing so was legally sufficient to support the application of 3B1.1, and in that case subpart B. But what I think is even more important from the court's holding in that case is that it says this was legally sufficient, notwithstanding the fact that the defendant did not recruit the drug couriers to enter the conspiracy or meet any of the other factors set forth in Note 4 to the commentary of 3B1.1. And I think this sort of gets to I think the bulk of Mr. Sardinus' argument, which is that, well, the government's shown maybe, and they of course debate this, but maybe we've seen the instruction to act as a drug courier, but we don't really hit any of these other factors that 3B1.1 finds to be so important. But what the Sixth Circuit says in Anderson, and what it says in a case United States v. Ospina, and this was cited in the United States' brief, is that the government doesn't have to. Somebody can be a manager or a supervisor without recruiting all of the members of a conspiracy. And it's important to point out that simply recruiting somebody to join a conspiracy doesn't lock in your participation or the role that you play in that conspiracy. And I think freezing one's relationship to the conspiracy at the point at which you recruit someone else into it ignores the way that the facts can develop in an investigation and how a conspiracy operates. This is another argument that's raised by Mr. Sardinus, which is that, well, because it was Mr. Rodriguez who allegedly recruited Mr. Sardinus to join his conspiracy, that he couldn't possibly have then had control exercised over him. Now, of course, I think this overstates the degree to which Mr. Rodriguez really recruited Mr. Sardinus, but nonetheless there's nothing that prohibits Mr. Sardinus from being recruited, however we want to define that term, and then later exercising a managerial or supervisory role over anyone else. One might follow the other. Indeed. Indeed, Your Honor. Let me, if I may, and if the judges will indulge me, raise a subject I was discussing with Mr. Sardinus' counsel, because I'm thinking this through literally as we sit here. First of all, am I correct or am I wrong, according to your understanding of the law, if you happen to have it in mind, that my safety valve approach as a district judge works? If I wind up giving a sentence that is within the unenhanced guideline range and apply the factors otherwise and recite my reasons, that this challenge should not be heard? Or am I wrong about that? Or don't you know? I'm not entirely sure I can point you to a case that's exactly your theory, but here are my thoughts on that. Because the United States didn't raise the harmless error argument in its brief, I simply can't swing at the pitch that you're throwing here that this is harmless error. So I'll neglect to do so. But I think perhaps the better practice for the sentencing court or perhaps even for the United States in this case is to put on the record that, regardless of whether the enhancement was applied or not, this will be the sentence that under Guidelines 32 or 30. And then the question is, if you're willing today, this morning, to accept that as a burden of the government, it certainly would be in the best position to do so. Along with the other, make sure that we tidy things up under Bostick. And Bostick is a terrific mandate from this court because I think it does avoid a lot of appeals that somebody overlooks and simply insert this into the Bostick litany. By the way, Judge, you found the enhancement. Are you able to say that had you not found the enhancement, this is a sentence that you would impose in any event? And if the judge says, yes, it is, which most judges probably would, candidly, because I think that's the way I operate. I go through all that stuff and then I say, okay, what's the sentence that fits this case and what he did, et cetera, et cetera, all the factors. I think Judge Carr is right. Assuming the enhancement was incorrect, was an error, if the judge had said, well, I would impose the sentence irrespective of the enhancement, and I think the sentence within the Guidelines would be procedurally and substantively reasonable. But did that occur here? No. Your Honor, if you look at page 353 of the record, that's where we see the district court's explanation of the actual term of imprisonment, 96 months, and candidly, I'll admit that the district court does not clarify that this is a sentence irrespective of the Guidelines. We do have cases that say that, that the sentencing judge makes a mistake in calculating the Guidelines, and that's a procedural error, that in the event he does that, but he says I wouldn't impose the same sentence anyway, well, then we'll say, well, it's harmless. But, okay. And to be clear, I think what we're discussing here is maybe best practices, and I'd hate to be misconstrued as saying the government always has to do this. I did not accept that as a concession on the part of the Attorney General that that's the way it's going to be, because I do think there's a burden of preservation issue here. I think it really belongs on the defendant. The defendant wants to preserve the issue that the enhancement, despite the variance, played a role in the outcome. Then it's up to the defendant to say, time out, Judge, did it play that role or not? And so often with Bostick, when the defendant raises that, it's going to get, you know, the result's going to be unwelcome to the defendant, candidly, okay, because we're going to protect the record. Understood, certainly. Your Honor, I think in the few minutes I have left, I do want to finish up with one sort of counter-argument to a point that Mr. Sardinus raises in his briefs, and this is the notion that the deliveries of pills to Chino by Mr. Rodriguez were not, in fact, deliveries, but they were instead separate transactions where Mr. Rodriguez was selling pills for his own benefit. I think this conclusion stretches the record beyond what it can support, because let's look to the testimony of Mr. Rodriguez, where he says, I bought pills from Mr. Sardinus for $22 to $21 a pill. Are we to then believe that he takes the quantity of pills that he receives, that he paid $22 per pill for, and then resells them for $1 per pill? Because that's the testimony that we have from Mr. Rodriguez, which is that he was paid $1,000 for every delivery, and delivery is a term he uses, of 1,000 pills. That's a $1 per pill price. If he is indeed a drug dealer at that point and not just a courier, he may be the world's worst drug dealer. There's no indication from Mr. Rodriguez that he was ever paid any principal amount or that even Chino was, quote, his client. Mr. Rodriguez, in his testimony, describes, and I believe this was even on cross-examination, describes Chino as a client of Mr. Sardinus. And this is where I think ultimately the court has to reach the conclusion that it was not a clear error for the factual determination of the district court that these deliveries were in fact that, deliveries, that they were organized by Mr. Sardinus in communication, like in Munoz's case, in communication with Chino, and that Mr. Rodriguez's role was that as support to Mr. Sardinus to deliver these pills and, in effect, remove him from the street-level drug dealing. And this seems to be a concern in the application of 3B1.1. And this is in, I believe, the Gonzalez case from this court. How did the defendant organize or structure the hierarchy of the conspiracy to create people that might assist him to remove him from the street-level dealing, make his drug dealing harder to ascertain from law enforcement's perspective? Is the relationship one of overseer and underling? Is that enough? It depends on how that's expressed, I think, Your Honor. In this case, I mean, is it fair to label Mr. Rodriguez as the underling? I wouldn't put it in a strictly hierarchical sense. I think this is a far more practical sort of consideration because these conspiracies can be very fluid. But what we do have here from the record is two occasions in which Sardinus instructed Mr. Rodriguez to deliver pills and that he did so to a man named Chino. That with this court's decision, not only the one that I mentioned in Anderson, but also the ones that the United States relies upon in Munoz, in Washington, and in Plunk. Albeit unpublished, the court in Plunk said, or a panel of this court said, that the use, the recruitment of another defendant to act as a drug courier in and of itself is sufficient to support the application of 3B1.1, notwithstanding the prior relationship that they may have had, and even if this courier activity only occurs once or on seldom occasions. I think that holding, albeit again in an unpublished case, is perhaps the most instructive in looking at how 3B1.1 views the exercise or control question. And unless the court has any further questions, I think that's where I'll end. I have none. Thank you. I have none. Mr. Kempler, you have three minutes rebuttal. Yes, Your Honor. I want to address something that the government said about the role of relative responsibility, and I think initially he misconstrued our argument and then he got it right. We're arguing that Mr. Benavides-Rodriguez bears at least as much, if not more responsibility for the conspiracy, because if you look at the conspiracy as a whole, Mr. Benavides-Rodriguez was the one who initiated the conspiracy. He's the one who approached Mr. Nunez. He's the one who proposed the initial transactions. And this court and the application note 4 both hold that recruitment is an essential function Even the case the government cites, Plunk, relies on the recruitment, that is the bringing into a conspiracy of another individual, as one of the key factors in determining whether an individual is more relatively responsible for the actions of a conspiracy. In this particular case, we have a recruitment element where Mr. Benavides-Rodriguez was the one who approached Mr. Nunez and proposed the criminal conspiracy. The other factors that the government alluded to that we rely on in assessing relative responsibility are explicitly stated in the background commentary, talking about the relative threat to public safety and the likelihood of recidivism, which again are specifically stated as some of the animating purposes behind the guideline. Maybe not the main one, but the main one is relative responsibility and it should be examined by looking at the conspiracy as a whole and not just by carving up the conspiracy and looking at... ...a separate little incident segment. Right. And if you look at the entire scope of the conspiracy, you come to a very different conclusion than if you just hive off the specific portion the government would like to focus on, which is the opportunity that Mr. Nunez gave Mr. Benavides-Rodriguez to make money. I also want to make a factual point about that. Mr. Benavides-Rodriguez makes clear in his testimony that he did not pay Mr. Nunez for the drugs that he delivered to Chino. He was paid upon their delivery about $1,000 per 1,000 drugs. So he was not out $21 a drug, as the government tries to imply. He was taking advantage of an opportunity that Mr. Nunez had provided him with, and we don't see the control exercised in this particular case that we see in cases that the government relies on, including in Anderson. In Anderson, we have a case where the defendant actually accompanied the minors to oversee them and make sure that they complied. And for those reasons, we ask this court to vacate the sentence and remand. All right. Any further questions? Thank you, Mr. Comfort, for your argument.